FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

00 MAR -7  AM 10: 55

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| STANLEY WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-97-S-456-NE |
| | ) | |
| DR. ELLIOT RAMPULLA, | ) | **ENTERED** |
| | ) | |
| Defendant. | ) | MAR - 7 2000 |

### MEMORANDUM OPINION

This action is before the court following a nonjury trial.
Plaintiff alleges defendant violated his Eighth Amendment rights by
being deliberately indifferent to serious medical needs, and he
requests compensatory damages, punitive damages, and corrective
surgery.  Upon full and thorough consideration of the pleadings,
testimony, and exhibits, the court finds in favor of plaintiff.

### I. FACTUAL BACKGROUND

Plaintiff, Stanley Washington, is a fifty-year old inmate of
the Alabama Department of Corrections.  He was incarcerated at
Limestone Correctional Facility ("Limestone") in Capshaw, Alabama,
at all times relevant to this lawsuit. Defendant, Elliot Rampulla,
M.D., a physician who specializes in anesthesiology and emergency
room services, was the medical director at Limestone during all
times relevant to this lawsuit.  Correctional Medical Services
("CMS"), a private entity providing health care services to inmates

housed in correctional facilities of the State of Alabama pursuant
to a contract with the Director of the state's Department of
Corrections, employed Dr. Rampulla in his capacity as medical
director.[1]  CMS has its own space within Limestone to operate a
health care unit ("HCU").  Dr. Rampulla typically spent forty hours
a week at Limestone.  Whenever he was not physically present in the
prison's HCU, however, Dr. Rampulla was "on call."  Dr. Rampulla
acknowledged that his ultimate purpose as medical director of the
Limestone HCU was to ensure that the medical needs of inmates were
properly diagnosed and treated at all times.

     The facts triggering suit begin simply enough: Washington was
participating in a recreational softball game at Limestone on
Friday, July 5, 1996.  He was the pitcher for his team.  A play
occurred that forced Washington to cover home plate, in an attempt
to prevent a runner rounding third base from scoring a run.
Washington and the base-runner collided, resulting in an injury to
Washington's left thumb.

     Washington immediately sought out a corrections officer

---

[1] The Alabama Department of Corrections has a nondelegable duty to provide
adequate health care to Alabama inmates. CMS, through its contract with that
Department, essentially steps into the shoes of that entity for legal purposes.
Accordingly, it is well-established that CMS' agents and employees act "under
color of state law" for purposes of 42 U.S.C. § 1983 when providing medical care
to inmates. *See Pinkney v. Davis*, 952 F. Supp. 1561, 1569 (M.D. Ala. 1999); *Swan
v. Daniels*, 923 F. Supp. 626, 633 (D. Del. 1995); *Unterburg v. Correctional
Medical Services, Inc.*, 799 F. Supp. 490, 497 (E.D. Pa. 1992).

2

watching the game, who escorted him to the HCU. Kathy Cloud, a
Registered Nurse employed by CMS, initially examined Washington.
Because Dr. Rampulla was not present at Limestone at the time of
Washington's injury,[2] Nurse Cloud paged him in order to discuss
treatment options. Before Dr. Rampulla answered the page, however,
a shift change occurred. Nurse Cloud departed the facility and
Margaret Test, another Registered Nurse employed by CMS, assumed
treatment duties for Washington.

Nurse Test recorded the following observations on Washington's
initial HCU record, referred to throughout the trial as a "Body
Chart": "[Left] thumb [with] obvious deformity at joint near hand.
Unable to move [left] thumb. Radial pulse palpable. ... [Probable]
dislocation [of left] thumb vs. [possible fracture]."[3] Nurse
Test's plan of treatment, before talking to Dr. Rampulla by
telephone, was to immobilize the thumb with an ace bandage and
apply ice, in an effort to reduce swelling. Washington testified
he was in so much pain that "he hurt all over."

Dr. Rampulla placed a telephone call to the HCU approximately

---

[2] Dr. Rampulla could not recall what he was doing over the Fourth of July
holiday weekend, but he made clear in deposition that he "didn't want to be at
Limestone." Deposition of Dr. Elliot Rampulla, attached as Exhibit 1 to
plaintiff's evidentiary submission in opposition to summary judgment (Doc. No.
59), at 159.

[3] Plaintiff's Trial Exhibit 11.

3

thirty minutes after being paged.  Nurse Test described the
condition of Washington's thumb to Dr. Rampulla, who asked certain
questions relating to whether Washington was suffering from
neurovascular compromise (such as whether the thumb was blue and
whether there was a loss of sensation at the thumb's tip).  Nurse
Test answered those questions in the negative.

Dr. Rampulla did not drive to Limestone that day or weekend to
personally examine or treat Washington, despite the fact that the
injury was deemed "urgent."  Nothing prevented Rampulla from
returning to Limestone, or sending Washington to a free-world
hospital; he simply opted not to do either.  Dr. Rampulla noted in
deposition that, had Washington presented the same injury in a
free-world emergency room, his course of treatment would have been
different.

> Q.  ... If a patient comes in the ER where you are
> working and describes to you the same symptoms that were
> described to you over the telephone regarding Mr.
> Washington, what would be your course of treatment for
> that ER patient?
>
> A.  Okay.  In that facility, I would have put a
> splint on him and transferred him to orthopedic surgery
> immediately. [4]

Instead, Dr. Rampulla instructed Nurse Test to relay three options
to Washington:  first, Washington could permit Nurse Test to

---

[4] Rampulla depo. at 292.

4

attempt a closed reduction of Washington's thumb, a procedure in
which the thumb is manipulated in an effort to reset a broken bone;
second, Washington could remain in the HCU over the weekend, and be
seen by Dr. Rampulla on Monday, July 8, 1996; and third, Washington
could return to his dormitory, and be seen by Dr. Rampulla on
Monday.

Nurse Test dismissed the first option, because nurses are not
permitted to perform closed reductions.[5]  Of the remaining two,
Washington chose to return to his dormitory, because he felt he
would be more comfortable there.  Washington was not permitted to
retain the ace bandage, however, because such materials are not
allowed in protective custody dormitories.  Nurse Test did provide
two latex gloves for holding ice.  Even though Washington testified
to being in a great amount of pain over the weekend — so much so
that he allegedly asked a corrections officer to take him back to
the HCU — the evidence establishes no record of a return trip.
With his ace bandage confiscated, Washington attempted to concoct
an immobilization device for his thumb with a belt.

Washington was given Motrin to relieve pain throughout the
weekend.  Dr. Rampulla, Nurse Test, and Catherine Mullins, Director

---

[5] One may infer from Plaintiff's Trial Exhibit 4 that the option was
discussed with Washington, based upon his recorded response: "I don't want my
thumb messed [with].  I'll come back Mon[day]."

5

of Nursing at Limestone, all testified that Washington would have received narcotic medication for pain, had he remained in the HCU. Once Washington returned to the dormitory, however, he forfeited his right to narcotic medication. Neither Dr. Rampulla nor Nurse Test could confirm at trial that Washington was fully informed that he would receive more effective pain medication by remaining in the HCU.

Dr. Rampulla arrived at Limestone on Monday, July 8, 1996, at approximately 5 a.m., but he did not conduct an initial examination of Washington's thumb until approximately 12:30 p.m. After reviewing x-ray film, Rampulla concluded that Washington had suffered an impacted fracture of his first metacarpal, with no joint compromise. The bones at the base of Washington's left thumb were crammed together in an improper position, however. Rampulla then attempted a closed reduction. After applying a local anesthetic, he manipulated the thumb in an effort to reset the bones. Rampulla assumed the procedure had been successful, based on a "popping" or "cracking" sound, but he did not empirically confirm proper positioning with a second x-ray. He then immobilized Washington's thumb with a cast.

Dr. Rampulla completed the reduction of Washington's thumb at approximately 1:15 p.m. Pedro Lopez, the x-ray technician who

6

worked at Limestone, kept regular hours of 7:00 a.m. to 1:00 p.m. on Mondays, Wednesdays, and Fridays. It is not clear whether Lopez still was on the Limestone premises at 1:15 p.m. What _is_ clear is that Lopez did _not_ take a post-reduction x-ray of Washington's thumb. What also is clear is that Dr. Rampulla had authority to send Washington to a free-world hospital for a post-reduction x-ray if Lopez had departed the prison's premises. Rampulla did not do so, even though both he and his expert, Dr. Melvin Russell, stipulated that the only way to confirm the success of a closed reduction is by taking an x-ray subsequent to the procedure.[6]

Instead, Dr. Rampulla directed Washington to return to the HCU on Wednesday, July 10, 1996, for a follow-up x-ray.[7]  Washington was unable to make his follow-up appointment, however, because he was "outgated": _i.e._, dispatched from Limestone to Jefferson County, Alabama, for a court appearance on Tuesday, July 9, 1996. Washington did not return to Limestone until the following Tuesday, July 16, 1996. (Apparently, neither Dr. Rampulla nor any other CMS employee understood that Washington was to be "outgated" on the 9th. Even so, after learning that had occurred, no instructions

---

[6] Dr. Rampulla could not recall why he failed to immediately take the follow-up x-ray. He conceded that there was no medical reason not to take the x-ray immediately following the reduction.

[7] Washington's treatment record show no notation indicating that he was scheduled for a follow-up x-ray on July 10th. Plaintiff's Trial Exhibit 4.

7

regarding treatment of Washington's thumb were communicated by CMS employees to Jefferson County during the period of July 9-16, 1996.)

Although Washington requested medical treatment for deep, throbbing pain in his thumb immediately following his return to Limestone on July 16th, he was not seen by Dr. Rampulla until Monday, July 22, 1996.   Dr. Rampulla ordered an x-ray, which revealed that the attempted reduction had been unsuccessful in resetting Washington's broken bones.

> Left wrist: A cast is in place.  The fracture of the proximal aspect of the 1st metacarpal is again evident. There has been no significant change in the position or alignment of the fragments when compared to the previous study of 7-8-96. [8]

Dr. Rampulla attempted a second closed reduction, which he again assumed was successful, based on the same sounds heard during the prior manipulation of Washington's thumb.   On this occasion, however, Dr. Rampulla took an x-ray immediately following the procedure.   The x-ray revealed no change.

> Left hand: Films were obtained following manipulation of the fracture of the 1st metacarpal.  There has been no change in the overall appearance of the alignment or position of the fracture fragments when compared to the previous study. [9]

---

[8] Plaintiff's Trial Exhibit 5, at unnumbered page 2.

[9] *Id.*

8

Dr. Rampulla then ordered Washington transported to a free-world facility, Cooper-Green Hospital in Birmingham, Alabama ("Cooper-Green"), for evaluation by an orthopedic specialist, Dr. Buford Moore.  Dr. Moore examined Washington on August 7, 1996,[10] and scheduled surgery for August 9, 1996.  Washington understood that Dr. Moore would either insert pins into, or attach a plate to, his thumb as part of the surgical procedure.  The consent form Washington signed to authorize surgery, however, indicated that any one of the following procedures might occur: "Closed Reduction, Possible Open Reduction, Internal Fixation of Left Thumb Fracture with Possible Insertion of Pins."[11]  Washington left Cooper-Green on August 9th under the impression that his thumb had been surgically repaired by Dr. Moore.

Washington returned to Cooper-Green on August 14, 1996, for a follow-up examination by Dr. Moore.  Only then did he learn that surgery had not been performed on August 9th, because the bones already had begun to heal (albeit improperly).  Instead, Dr. Moore related that he had attempted yet a third closed reduction while Washington was under general anesthesia, which proved as

---

[10] Dr. Rampulla could not account for the more than two week delay between his referral of Washington to Cooper-Green and Washington's initial appointment at that facility.

[11] Defendant's Trial Exhibit 1.

9

unsuccessful as the two previous procedures. Dr. Moore recommended that Washington perform a number of rehabilitative exercises to improve the range of motion for his thumb. Washington admitted that he did not perform those exercises religiously.

Although Washington requested medical treatment from CMS personnel on August 16th for pain and swelling, he was not examined again by Dr. Rampulla until September 3, 1996. Dr. Rampulla had not been in contact with Dr. Moore or anyone else from Cooper-Green in the meantime. Washington continued to complain of pain on September 3rd. Dr. Rampulla did not remove the bandages on Washington's thumb to discern the procedure performed at Cooper-Green. Further, he did not request any records regarding Washington's treatment at Cooper-Green.[12] Rather, Dr. Rampulla prescribed Dilantin, a medication primarily used to combat seizures. He attempted to justify that prescription by testifying that Dilantin also would alleviate pain arising from nerve irritation.

Dr. Rampulla next saw Washington on October 1, 1996. He ordered another x-ray of Washington's thumb. That x-ray was analyzed on October 2, 1996:

---

[12] Catherine Mullins eventually requested Washington's records from Cooper-Green, upon learning that no surgery had been performed.

10

> Left hand: A fracture involving the base of the 1st
> metacarpal is again noted. Little callus formation is
> evident about the fracture site. There has been no
> significant change in the position or alignment of the
> fragments when compared to the previous study of 7-22-
> 96. [13]

Dr. Rampulla did not contact Dr. Moore or any other Cooper-Green
representative to discuss the prognosis of Washington's thumb. He
did not inquire into why surgery had not been performed.

Washington's hand was x-rayed at Cooper-Green again on January
13, 1997.

> LEFT HAND 1-13-97: Fracture of the base of the 1st
> metacarpal appears to be chronic and firmly united. The
> rest of the examination is unremarkable and otherwise
> there is no change. [14]

As a result of the improper healing process, Washington is limited
in the use of his thumb. He testified that his injury precludes
him from participating in various recreational activities,
including softball and volleyball. The injury also makes it more
difficult for him to carry out responsibilities as a prison Law
Clerk. Particularly, he has difficulty typing. Finally,
Washington's thumb still causes a degree of pain, particularly when
the weather is cool. Washington is presently incarcerated in
Holman Correctional Facility, in Atmore, Alabama. Dr. Rampulla is

---

[13] Plaintiff's Trial Exhibit 5, at unnumbered page 3.

[14] Plaintiff's Trial Exhibit 7, at unnumbered page 3.

11

no longer employed by CMS.

## II. LEGAL BACKGROUND

Washington commenced this action *pro se*, and against a number

of defendants, on February 25, 1997.   All defendants except Dr.

Rampulla were dismissed prior to trial.[15]  Washington sues under 42

U.S.C. § 1983,[16] contending that Dr. Rampulla violated the Eighth

Amendment by being deliberately indifferent to his serious medical

needs.

In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d

251 (1976), the Supreme Court held that deliberate indifference to

a prisoner's serious medical needs contravened the Eighth Amendment

---

[15] This court adopted the Report and Recommendation of United States
Magistrate Judge Paul W. Greene entered on December 8, 1997 (Doc. No. 17), which
dismissed Catherine Mullins, Kathy Cloud, Margaret Test, Guy Noe, Dr. Buford
Moore, Dr. Mark Buchard, and Correctional Medical Services as defendants.  (Doc.
No. 18.)

[16] Section 1983 creates a cause of action against any person who, acting
under color of state law, abridges rights created by the Constitution and laws
of the United States.  That statute provides:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress.  For the purposes of this section, any Act
> of Congress applicable exclusively to the District of Columbia shall
> be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.

12

prohibition against cruel and unusual punishment.[17]  Specifically,

the Court in *Estelle* concluded that the "deliberate indifference to

serious medical needs of prisoners constitutes the 'unnecessary and

wanton infliction of pain,' proscribed by the Eighth Amendment."

*Estelle*, 429 U.S. at 104, 97 S.Ct. at 291 (quoting *Gregg v.*

*Georgia*, 428 U.S. 153, 182-83, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859

(1976)).

It is clear that Washington's fractured thumb constituted a

"serious" medical need. *See Estelle*, 429 U.S. at 103, 97 S.Ct. at

290; *Hill v. Dekalb Regional-Youth Detention Center*, 40 F.3d 1176,

1187-88 nn.21-22 (11th Cir. 1994) (distinguishing "serious"

physical conditions from "nonserious" ones).

"Deliberate indifference" must be distinguished from medical

negligence, or "malpractice." *See Estelle*, 429 U.S. at 106, 97

S.Ct. at 292 (noting that "a complaint that a physician has been

negligent in diagnosing or treating a medical condition does not

state a valid claim of medical mistreatment under the Eighth

Amendment").  In *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970,

128 L.Ed.2d 811 (1994), the Court elaborated on what is required to

---

[17] The Eighth Amendment applies to the states through the Fourteenth
Amendment. *See Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420,
8 L.Ed.2d 758 (1962).

13

prove deliberate indifference:

> [A] prison official cannot be found liable under the
> Eighth Amendment for denying an inmate humane conditions
> of confinement unless the official knows of and
> disregards an excessive risk to inmate health or safety;
> the official must both be aware of facts from which the
> inference could be drawn that a substantial risk of
> serious harm exists, and he must also draw the inference.
> ... An act or omission unaccompanied by knowledge of a
> significant risk of harm might well be something society
> wishes to discourage, and if harm does result society
> might well wish to assure compensation. The common law
> reflects such concerns when it imposes tort liability on
> a purely objective basis. But an official's failure to
> alleviate a significant risk that he should have
> perceived but did not, while no cause for condemnation,
> cannot under our cases be condemned as the infliction of
> punishment.

*Id.* at 837-38, 114 S.Ct. at 1979 (citations omitted). Under

*Farmer*, therefore, a plaintiff alleging deliberate indifference to

serious medical needs must prove not only knowledge of an excessive

risk to health, but also disregard of that risk. *See Campbell v.*

*Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999). "Proof that the

defendant should have perceived the risk, but did not, is

insufficient." *Id.* (citation omitted).

In its most recent summary of the requirements of *Estelle* and

*Farmer*, the Eleventh Circuit held that "deliberate indifference has

three components: (1) subjective knowledge of a risk of serious

harm; (2) disregard of that risk; (3) by conduct that is more than

14

mere negligence." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th

Cir. 1999).     In an effort to distinguish this concept from

negligence, the Eleventh Circuit defined "certain categories of

action or inaction that may constitute deliberate indifference":

> We have repeatedly found that "an official acts with
> deliberate indifference when he or she knows that an
> inmate is in serious need of medical care, but he fails
> or refuses to obtain medical treatment for the inmate."
> *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425
> (11th Cir. 1997); *Mandel v. Doe*, 888 F.2d 783, 788 (11th
> Cir. 1989) .... Even where medical care is ultimately
> provided, a prison official may nonetheless act with
> deliberate indifference by delaying the treatment of
> serious medical needs, even for a period of hours, though
> the reason for the delay and the nature of the medical
> need is relevant in determining what type of delay is
> constitutionally intolerable. See *Harris v. Coweta
> County*, 21 F.3d 388, 393-94 (11th Cir. 1994); *Brown v.
> Hughes*, 894 F.2d 1533, 1537-39 (11th Cir. 1990). We have
> also held that deliberate indifference may be established
> by a showing of grossly inadequate care as well as by a
> decision to take an easier but less efficacious course of
> treatment. See *Steele v. Shah*, 87 F.3d 1266, 1269-70
> (11th Cir. 1996); *Waldrop v. Evans*, 871 F.2d 1030, 1035
> (11th Cir. 1989).     Moreover, "[w]hen the need for
> treatment is so obvious, medical care which is so cursory
> as to amount to no treatment at all may amount to
> deliberate indifference." *Mandel*, 888 F.2d at 789;
> *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704
> (11th Cir. 1985).

*Id.*

### III. DISCUSSION

**A.   Liability**

In his brief in opposition to summary judgment,[16] Washington
makes compelling arguments regarding why Dr. Rampulla should be
considered deliberately indifferent. Those arguments focus on the
rampant delays occurring throughout treatment of Washington's
thumb, and, Dr. Rampulla's repeated decisions to pursue easier,
less effective courses of treatment. The circumstances surrounding
treatment of Washington's thumb do not fall neatly into either of
those categories, however. The "delay" cases focus primarily on an
individual's failure to receive any medical treatment whatsoever
over a significant period of time. *See, e.g., Brown v. Hughes*, 894
F.2d 1533, 1536-37 (11th Cir. 1990) (plaintiff went for a period of
six hours without any medical treatment for a broken foot, and no
nurse was on duty despite written policy that nurse should be on
duty at all times). Here, Washington was immediately received into
the HCU, and diagnosed by Nurses Cloud and Test as well as Dr.
Rampulla. The "less effective treatment" cases, on the other hand,
focus on a physician's failure to recognize the gravity of an
individual's medical condition. *See, e.g., Steele v. Shah*, 87 F.3d
1266, 1267-68 (11th Cir. 1996) (defendant, who only examined

---

[16] *See* Doc. No. 60.

16

plaintiff for a minute and reviewed none of his medical records
from prior institutions, discontinued plaintiff's use of
psychotropic medication); *Waldrop v. Evans*, 871 F.2d 1030, 1032
(11th Cir. 1989) (plaintiff, a manic depressive, immediately taken
off of all medication by defendant upon arrival at new correctional
facility).   Here, Dr. Rampulla recognized that Washington had
suffered a fractured thumb and needed treatment.

Even so, when all the disparate events occurring between the
date of Washington's injury and the conclusion of his "treatment"
are viewed as a mosaic, the whole of that pattern is greatly more
expressive than the sum of its parts.  The picture that is revealed
is one of grossly inadequate care — care that is so cursory as to
amount to no treatment at all.   Dr. Rampulla, admittedly the
ultimate provider of health care for Washington, had countless
opportunities to right wrongs committed during the course of
Washington's treatment.  He failed to capitalize at all junctures.
He failed to order Washington to stay in the HCU during the weekend
of July 6th and 7th, so that he could receive narcotic medication
and have his thumb properly immobilized; he failed to conduct a
follow-up x-ray immediately after the initial reduction of
Washington's thumb; he failed to inquire why Washington missed his
follow-up appointment on July 10th; he failed to contact health

17

care personnel in Jefferson County, Alabama, upon being told that Washington had "outgated"; he failed to examine Washington immediately after his return from Jefferson County on July 16th, to confirm the success of the initial closed reduction; he failed to confer with Cooper-Green orthopedic physicians after Washington supposedly had undergone a surgical procedure on August 9th;[19] he failed to recognize during the September 3rd appointment that no surgical repair of Washington's thumb had been attempted at Cooper-Green; and he failed to explore other opportunities for improvement of Washington's thumb after analyzing all the x-rays, which indicated that the fracture had not healed properly.

It is not this court's job to inquire into whether Dr. Rampulla was negligent in failing to properly set Washington's broken thumb on two separate occasions. Those questions focus solely on whether Dr. Rampulla committed medical malpractice. As discussed earlier, medical malpractice does not rise to level of an actionable constitutional tort under 42 U.S.C. § 1983. Rather, it

---

[19] This court cannot understand why the lines of communication between CMS and Cooper-Green are so strained. The testimony at trial indicated that the relationship and conduct of those two entities is a classic illustration of the "left hand not knowing what the right is doing." Further evidence of this point exists in the Department of Corrections' failure to inform CMS personnel that certain inmates requiring medical care, like Washington, were due to be "outgated" for court-related matters. The overall lack of coordination reflects a state of disorganization and sloppiness that places the errors of Dr. Rampulla in his treatment of Washington in a broader, more troublesome context.

18

is the above points that concern this court.  Viewed as a whole,
those repeated failures to timely explore more efficacious
treatment options create a tort of constitutional dimension.

    This court concludes not only that Dr. Rampulla was aware that
a substantial risk of serious harm to Washington's thumb existed,
but also that he deliberately proceeded with grossly inadequate
treatment in the face of such risk.  The multiple errors in
treatment, compounded one on top of another, reflect an inexcusable
disregard for the welfare of inmate Washington.[20]  From the moment
Dr. Rampulla was informed of Washington's injury, he pursued a
course of treatment that was most convenient to him, but most
detrimental to Washington.  Even at the point when x-rays revealed
that Washington's thumb injury had taken on a permanent character,
Dr. Rampulla doggedly maintained his opinion that Washington had
received proper medical treatment.  Such grossly substandard
treatment and apathetic care contravenes the Eighth Amendment.

    As early as 1958, the Supreme Court recognized that the Eighth
Amendment "must draw its meaning from the evolving standards of
decency that mark the progress of a maturing society."  *Trop v.*
*Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)

---

[20] This court also notes that Dr. Rampulla's demeanor throughout the trial
reflected a certain nonchalance and lack of interest in the court proceedings
themselves.

19

(Warren, C.J.).  Because standards of decency continue to evolve, society must be careful not to set the constitutional bar so high that it prohibits recovery in cases like this one, where a minor incident that should have been routinely cured winds up creating permanent injury to an individual under the care of the State of Alabama.  Setting the standard so high not only leads to unjust results, but also encourages a standard of medical care that pushes the edges of the malpractice envelope.  When those limits are exceeded by gross conduct, such as occurred here, this court has a duty to right a wrong.  Accordingly, this court finds for Washington on the issue of whether Dr. Rampulla's conduct constituted deliberate indifference to his serious medical needs.

**B.   Damages**

Assessment of damages in this case is no easy task. Washington is serving a life sentence with no expectation of parole.  Thus, information regarding his prior work history and life expectancy is irrelevant to the computation of compensatory damages.  Nonetheless, this court must proceed to determine the proper amount of compensatory damages and related relief.  Further, it must analyze whether Washington has adduced sufficient evidence to warrant imposition of punitive damages.

20

## 1. Compensatory damages and related relief

The basic purpose behind an award of damages under 42 U.S.C. § 1983 is "to compensate persons for injuries that are caused by the deprivation of constitutional rights." *Carey v. Piphus*, 435 U.S. 247, 253-54, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978). Compensatory damages include not only out-of-pocket loss and other monetary harms, but also personal humiliation, pain, suffering, and mental and emotional anguish. *See Memphis Community School District v. Stachura*, 477 U.S. 299, 307, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986). In *Stachura*, the Court went further to note that "[d]eterrence is also an important purpose of this system, but it operates through the mechanism of damages that are *compensatory* — damages grounded in determinations of plaintiffs' actual losses." *Id.* (emphasis in original).

With the foregoing principles in mind, this court finds that Washington is due to recover $3,000 in compensatory damages for mental anguish, pain, and suffering related to the improper treatment of his fractured thumb by Dr. Rampulla from July through October of 1996. *Cf. Carswell v. Bay County*, 854 F.2d 454, 455-56 (11th Cir. 1988) (affirming jury award of $10,000 in compensatory damages based on failure of certain defendants to diagnose and

21

treat plaintiff's diabetic condition, which caused him to become very ill and lose approximately fifty-three pounds). Further, this court concludes that Washington is entitled to reevaluation of his fractured thumb by a competent (preferably board-certified) orthopedic specialist, at the expense of Dr. Rampulla. The purpose behind such reevaluation is to consider whether corrective surgery could improve Washington's use of his thumb. If corrective surgery would be efficacious, then the cost of such surgery shall be borne by Dr. Rampulla.

### 2.   Punitive damages

Punitive damages may be assessed in a section 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983)). In *Coleman v. Rahija*, 114 F.3d 778 (8th Cir. 1997), the Eighth Circuit noted that "[a] finding of deliberate indifference to a serious medical need, while establishing liability under § 1983, does not necessitate a finding of callous indifference warranting punitive damages." *Id.* at 787. This statement comports with the Supreme Court's logic in *Stachura*, which emphasized that

22

compensatory damages under section 1983 should also play a deterrent role. *See Stachura*, 477 U.S. at 307, 106 S.Ct. at 2543.

Under that rubric, only the most egregious and outlandish conduct — conduct "ris[ing] to the level calling for punishment and deterrence over and above that provided by the compensatory award" — justifies the imposition of punitive damages. *Coleman*, 114 F.3d at 788. *See also Riley v. Camp*, 130 F.3d 958, 983 (11th Cir. 1997) (Kravitch, J., concurring in part and dissenting in part) (listing Eleventh Circuit cases where punitive damages were awarded under section 1983). This court finds that Washington has failed to justify the imposition of punitive damages against Dr. Rampulla, because he has not shown that Dr. Rampulla was motivated by an evil intent. While it is clear that Dr. Rampulla's conduct was grossly negligent and deliberately indifferent, it was not callous. *See Coleman*, 114 F.3d at 788 ("The facts of this case illustrate the difference between conduct justifying mere liability under the Eighth Amendment and conduct justifying punitive damages under § 1983.").[21] In other words, the facts and circumstances

---

[21] In *Coleman*, the plaintiff-inmate, who was pregnant, suffered from a "long history of problematic pregnancies." *Coleman*, 114 F.3d at 781. She was transferred to the Iowa Medical and Classification Center, where defendant was employed as a nurse. *See id.* On the night plaintiff went into labor, defendant twice ordered plaintiff to return to her cell despite Coleman's complaints of pain and bleeding. *See id.* at 782-83. Upon returning to her cell the second time, plaintiff's pain increased. *See id.* at 783. She even "expelled

23

surrounding this case make clear that no deterrence-based sanction over and above compensatory relief is necessary.

### IV. CONCLUSION

For the foregoing reasons, the court finds in favor of plaintiff under 42 U.S.C. § 1983. An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this ___7th___ day of March, 2000.

_____
United States District Judge

---

approximately 15cc of dark red blood." *Id.* Defendant and another nurse eventually transported plaintiff to a free-world hospital, where she delivered a premature baby boy. *See id.* Neither plaintiff nor her child suffered complications during the delivery. *See id.*

   Coleman filed suit under 42 U.S.C. § 1983, contending that Rahija had been deliberately indifferent to her serious medical needs by repeatedly ordering her back to her cell. The trial court found in favor of plaintiff after a nonjury trial, and awarded her $1,000 in compensatory damages and $3,500 in punitive damages. On appeal, the Eighth Circuit affirmed the award of compensatory damages, but vacated the award of punitive damages. *See id.* at 788 (noting that defendant "relied on, and attempted to follow, the ... physicians' instructions in caring for Coleman").